Good morning, and may it please the Court. Anna Rose Matheson on behalf of Appellant Lester Shinault. I'd like to reserve four minutes for rebuttal. All right. You have a clock there, and I'll try to help you as well. Thank you very much. I'll begin by addressing the two cases the Court noted in its order last Monday, Sickles and Montañez. We think both of these cases are useful in explaining exactly why a pre-deprivation hearing was required in this case. Both cases recognize that prisoners have a protected interest in property in their inmate trust account. The Third Circuit case, Montañez… What are you asking for, though? Do you want a pre-notice hearing? As I understand it, this commences, in essence, with a demand letter, a notice to the inmate saying, we owe you the money. So is it your position that some sort of a presentation should be made to, let's say, an administrative law judge prior to the issuance of the notice? Or are you asking for a hearing before the funds are actually taken? We're asking for a hearing before the funds are taken from the inmate, which in this case occurred well before the hearing. Could you just define for us what taken means? Because, of course, the funds remain with the State, so to speak. But in this case, there's a notation on the record that they're either segregated or designated for the repayment of his prison costs. So at what point are they taken? Yes, absolutely. That can be a difficult question. So the Third Circuit, in the Burns case, wrestled with all the sticks in the bundle of property rights that there are. And it dealt with a case where there's simply an attachment of assets. So the funds remained totally accessible to the prisoner. And they found even an attachment, essentially a lien, would qualify as a taking for purposes of due process here, requiring a pre-notice. And your answer to my question was that you wanted a hearing before the notice even issued? Or are you asking for a hearing before the funds are actually taken? Right. So in this case, the process starts with the ability to pay order. And that was issued on May 29th. And so, no, we don't – to the extent that that simply starts the process and allows the prisoner to know that these funds are potentially challenged, that would be – we don't need that in this case to win. Because the notice basically told him we're demanding $65,000 and you have a right to a hearing. Right. And he exercised that right. Exactly. Okay. So what additional process do you believe the Constitution requires? Right. So they sent that notice on May 29th. He received it on June 1st. On June 2nd, they took the funds out of his general inmate trust account and transferred it into a miscellaneous reserve account. It was nominally under his name, but he had no access to it. So it's kind of like a blocked account, a frozen account? Exactly. And so he had – But didn't he release some money out of it? I thought there was – the record suggests maybe $3,000 or four. So there were garnishment orders that were paid out of that account. But those state-approved garnishment orders were the only ones that came out of that, the seized funds. Help me with the discrepancy between $61,000 and $65,000 because that's – the record is very confusing on that score. I do understand. So the $61,000 versus $65,000 issue, those – that is garnishment funds. Excerpts of record 152 and 153 are – is transcripts from the hearing before the ALJ. I think where the state kind of sets that out, that they took these pursuant to state-approved garnishment orders. Did he have counsel at the hearing? He did not. And did he make requests of Oregon officials for funds to hire a lawyer? He did. And were they denied? They were. So where did – On occasion? The record only – the record only contains evidence of, I think, the fact that he had asked Mr. Hawks for the funds to hire an attorney. So to be clear, he first – he did get $11,000. That's what I wanted to ask you about. So what did that go for? So that did – that was – he attempted to hire an attorney. So he had over – Well, he did hire one. He hired this guy. And $11,000 is not insignificant. That is true. So he had over $100,000. The state took $65,000. They paid over $20,000, $25,000 for state-approved garnishment orders. And we're not actually challenging those in this proceeding, even though those were also done without notice in the hearing. But so out of the funds the state made no claim on, essentially the funds that he had left other than the funds that they seized, he did withdraw $11,000 to hire an attorney for that hearing. And the attorney entered a notice of appearance and requested an extension of the hearing date. Yes. But then withdrew before the hearing date. Yes. So where does that leave us with regard to the response to Judge Hawkins' question? Right. So at that point, he asked for additional funds. The record isn't entirely clear on what – why that withdrawal happened. Could I just – we just want to get all this. When you say you asked for additional funds, that's in the hearing? No, it was actually before the hearing. He tried to – so he did definitely ask during the hearing repeatedly to hire an attorney. But the regulations say you have to make a written request. And do we have any written requests? Sorry, the written request for the hearing? No, for the money. For the money. So the – For the money to pay another lawyer. For the money to pay another lawyer. So this actually happened after he was released from jail, where the state still had the funds. And so in the normal course, when a prisoner is released, funds in the prison trust account would be paid out upon the prison's release. So it's actually one of the kind of clearest reasons in this case that this – the state was essentially – had seized the funds and did not give them back to him. They kept the $61,000, $65,000 even after Mr. Chenault was released. So he did – the record isn't clear on whether – on the form that request was, but it does say, and defendants conceded for purposes of summary judgment here, that at some – that he'd asked – he'd asked for funds and Defendant Hawk said the funds would remain in his care until after the hearing. So – So is it your position that once the notice is issued and a request for a hearing is conducted, that he should have the right of unfettered access to the money that the state is claiming so that he could spend it down prior to an order directing him to pay it? Is that your position? Our position is that a pre-deprivation hearing is required. But he had a hearing scheduled. The question I'm asking is can he waste the asset prior to the hearing? So this is obviously an issue that could come up in any case where – Well, I think your position is yes, isn't it? So the state certainly can come after – it is, effectively. It's a very simple question, counsel, yes or no. Yes, he can waste the asset until he's actually ordered to pay it to the state. Yes, that's true. Okay, so if we – Once his attorney had withdrawn and he made the request for additional funds, did he say how much he needed? The record doesn't reflect that. And is that because – I mean, that's where I got into my – it doesn't matter whether he's in or out of prison, they say you're supposed to make these requests in writing, but we don't have any documentation, right, other than that a request was made? So we don't have the written request here. I think some of the confusion is the fact that this is – he was obviously unrepresented below. Not only – so he did put in evidence that he hadn't requested – No, why don't you answer the question. Is there any written record of these requests? No, not in the record here. So then the question comes, when we get all this stirred together, to qualified immunity in terms of where was it clearly established that such a hearing would be required? And as Judge Tallman suggested, that even before the hearing, he could spend down the money. Where was that clearly established? Well, so 30 years ago this court held in Prick v. Jones that a pre-deprivation hearing is required before the state can take money in an inmate trust account. That was a permanent deprivation, was it not? It wasn't a provisional attachment. That was like they took it and it's end of story. That is true, but the effect is exactly the same here. Here they took it. He had no access to that money from June 2nd forward. How is this any different, counsel, from a civil asset forfeiture proceeding where the government obtains a freeze order preventing the defendant from spending any money in his bank account except for necessary and incidental expenses for living and for hiring counsel? Well, in the civil forfeiture context, first the government has to get a judicial finding of probable cause to believe the defendant has committed the crime and a judicial finding of probable cause to believe the assets are traceable to the conduct. Traceable or you can also substitute assets, can you not, under the asset forfeiture laws to satisfy the obligation? Well, but effectively I'm not sure of that specific. Because the wrong relates back to the time of the criminal act. So the lien in favor of the government arises by operation of law when the illegal conduct occurs. Right. So the question I have is why is this not analogous to the fact that he's already incurred the cost of incarceration for however many months he was in custody of the Oregon Department of Corrections. So in essence, he's already used up the room and board charges that the state's seeking to recuperate. Why is that any different from a civil forfeiture proceeding when the wrong relates back to or the lien relates back to the time of the wrong? Well, so first, the civil forfeiture, both before the assets can be taken, a judge must sign off on this probable cause. And second, there is no sense for those assets are, whether their particular ones are traceable or analogous amount are traceable. You're using the word taken, but the problem I'm having with the record is I'm not sure when the taking occurs. Does the taking occur when the administrative law judge issues the order in December, in essence confirming the state's claim and authorizing them to, in essence, transfer title of the property to the state? Or does it occur when the account is blocked so that he can only withdraw funds out of it for certain purposes like hiring counsel? So our position is the taking in this case occurs on June 2nd. When they transfer the money, there's actually a withdrawal out of his account, and it goes to that account. Whether or not his name is ostensibly on it, he can have no access to that. And obviously, had he tried to request the money for things outside the prison regulation purpose, as he said, you know, he wanted the money to, you know, buy guns or that sort of thing. Obviously, we wouldn't be challenging that. But he wanted the money to hire an attorney.  They gave him the money to hire the attorney. Not any of the seized funds. So none of the seized funds that they took went to that. That was the money he took to hire an attorney was out of the funds the state did not attempt to seize. But in other words, he didn't suffer any detriment. He didn't ask for any funds that weren't given to him. Is that true? No, because after the attorney withdrew, he asked. And at that point, he's been released for that short period, right? And at that point, he should have had the funds had the state not seized them. Okay. You have just a couple minutes left. Do you want to save your time? Does the Court have any specific questions about Sickles? I do think that going through the case came out the other way. But if you look at every factor in Judge Sutton's analysis there, every factor that Judge Sutton points to in Sickles in explaining why, under the facts of that case, a pre-deprivation hearing was not required, cuts the other way here. Thank you. Thank you. Thank you. May it please the Court, Pinesh Shah on behalf of the ODOC defendants. Before addressing the legal issues here, I want to hit on what to me is a very important factual issue here, which is that there were two separate actions with respect to these funds. It seems like the Court understands that there was first a freeze or a block or a segregation of these funds on June 2, 2009, without taking title or withdrawing these funds, and that didn't occur until 2010, much later, well after even the full deprivation hearing. I hope the Court understands we're on the record. I understand that, but the question I have is under state law, when you get out of the facility, they're supposed to give you back all your money. Unless they're subject to some dispute, as is the case here. Right. But they didn't give him back all his money. They just, at that point, they let him have the $5,000 to live on, correct? Correct. And then they'd already garnished legitimately a series of funds. And $61,000 remained in his trust account under his name pending the outcome of this hearing. Had this hearing come out the other way, then the state would have given him those funds. The state dispute that, after his original counsel withdrew, that Chenault asked for to withdraw funds to retain new counsel? As I read the record, it's not entirely clear. He says he wanted funds to hire counsel. He says that he asked for money, and an ODAC official told him that the funds were- Let's assume he didn't do anything before the hearing. He clearly, at the hearing, asked for it, didn't he? He did, though not in writing. What was the ALJ's response? The hearing officer, what was the response? I think what he asked for, actually, was more time to get an attorney, as opposed to asking ODAC to give him money for that purpose. And the ALJ's response to his request for more time was, we've already set this over once before, and if you had asked me before this hearing, perhaps I would have entertained that request, but we're already here, and I'm not going to entertain the request when you make it here at the hearing. So you're saying at no point did he ask to withdraw additional funds for the purpose of obtaining representation? I can't say whether he did or he didn't. I see nothing in the record that definitively establishes that. Some questions were asked about wasting this money. Is there any evidence in the record that Chenault intended to waste this money? There's no evidence that he intended deliberately to- The answer to my question is no. No, there's no evidence he intended to waste the money. I think the record does show that he was spending the money at a fairly rapid clip, and he did have access to and spend about $20,000 of these funds, the garnishments aside. And I think to go back to Judge Thomas' point about civil forfeiture, I think this is exactly analogous. And the Supreme Court has said that under the Sixth Amendment, a defendant has no right to spend somebody else's money. This is in the Cayley case, the U.S. Supreme Court case in Cayley, that a defendant has no right to spend somebody else's money to hire a lawyer. The result of the hearing was to give him $5,000? The result of which hearing, I'm sorry? Didn't he ultimately receive $5,000? He received $5,000 when he was released from prison, before the hearing. Okay. And was any determination made as to how to-what that was for, the reasons for it or the reasons that supported it? So at the time that he was released and received the $5,000, that was just sort of-that's just what ODOC does. I think now it's a little bit more, but at the time they just sort of reserved it. If the $5,000 is there, there is a- Is it plucked out of thin air? I think that the substantiation is found later in the ALJ's final order, where they have some sort of calculation of living costs. It's intended for three months, which is what the regulations require. Funds sufficient to support the defendant or the prisoner for three months, and they have a formula that they use. So ODOC applied that formula. Did that formula take into consideration the purpose of the settlement monies? It did not, no. No, Your Honor. Did any part of that $5,000 have anything to do with the medical treatment he might need as a result of contracting diabetes? As I understand it, he would have received $5,000. Every prisoner who has $5,000 gets $5,000. That's my understanding. So really the only purpose of the hearing then is to determine if he gets more than $5,000? Yes. Yes, I think that's correct, Your Honor. And to the extent that- So the hearing is not really about whether you should take my 65, which is established by law and by a formula, but it's whether the prisoner should get an additional amount due to his circumstances. So it's whether the state should, as a matter of discretion, waive its right to collect that $65,000. That's what the purpose of that hearing is. But the hearing deals just with the claim that's covered in the notice of payment, right? The amount of money. Correct. You're right. So that amount is owed. That's the scope of the hearing. Is the state entitled to $65,000? And to the extent that the prisoner raises a claim that he's entitled to a waiver, that gets adjudicated there as well. Okay. And that's a matter of discretion. But whatever balance remains out of the $110,000, he gets that because it's free and clear. He would have gotten that. Had he not spent down that money before he was released, he would have gotten the money when he was released. If he had gotten, say, $200,000 and spent it down to $85,000 or something, the difference between $65,000 and the balance on release, he would have had given to him free and clear. All right. So help me clarify the sequence of events. A notice of, I'll call it a demand notice, is issued. Then at some later point, what, a couple of months later, the accounts are, quote, unquote, frozen? I would say it was May 29th to June 2nd. Okay. So a few days later, the money is frozen. So at least $65,000 cannot be withdrawn. Right. He demands a hearing, and a hearing is set. Did anything happen from June 2nd until the date of the hearing to the money, or did it just sit in the blocked account? Well, on June 2nd, he had, I think, $85,000 in the account. So $65,000 was swept into this sort of segregated account. About $20,000 remained. And then I think there was about $2,000 was given to his counsel. He spent some money at the commissary. Ultimately, he was released. And I think prior to his release, he had whatever was left that was not segregated also released to his counsel. Okay. But in the meantime, the $65,000 sits there. Right. And some garnishments were satisfied out of it, which is the difference between $65,000 and $61,000 because he had depleted his funds. Now at the time of the hearing, it's $61,000. Yes, correct. And then the ALJ issued his order awarding the funds to the state at the end of December, correct? Correct. Then was it after that order was entered that the state actually swept the $61,000 out of the account and transferred it to its own? Yes, it wasn't immediately. That was December 2009. It didn't finally exercise its right to set off and sweep those funds until about October 2010. In between, I think he had a chance to submit another written notice. The record is not entirely clear. He references in his complaint some other hearing. It's my understanding he received some sort of other chance to object, at least in writing, if not in person. But then ultimately, yes, that was. So what's the state's response to Mr. Chenault's argument that he's entitled to, I'll call a pre-freeze hearing before the money can be blocked? Our position is he's not entitled to any. He's certainly not entitled to a pre-freeze hearing. It's also our position that because of the regulations governing trust accounts, he doesn't even have a property interest. He has no state law-recognized entitlement to prevent ODOC from freezing his monies, as they did, because the regulations governing those trust accounts expressly provide ODOC with authority to do exactly what they did. Well, the regulations essentially establish, do they not, a statutory claim for the money. I guess we could analogize it to a lien for room and board. Those are the cost of care regulations. There's also a set of regulations governing the trust account, and those regulations say that the state- Okay, but the first set of regulations creates the basis of the state's claim. Correct. Okay. And then you're pointing me to the inmate trust account regulations that authorize the freeze once the notice is issued. Yes, Your Honor. So what's the burden on the state from having to, let's say, present an affidavit to an administrative law judge in advance of the issuance of the freeze order? What's the burden? I suppose you mean what's the burden that justifies them doing it without any further notice? No. I want you to respond to Mr. Chenault's due process argument that before my money can be frozen, I'm entitled to some kind of a hearing to challenge the propriety of the freeze order. So there's a number of cases that support the idea that when the government has an interest in preventing depletion of funds and collecting a debt that's rightfully owed to the government, a pre-deprivation hearing is not necessarily required, especially when, as here, a risk of erroneous deprivation is low because the disputed issue really is one of arithmetic. You know, I understood Judge Talmon's question to ask you what the burden would be on the state. Did I hear that correctly? That was my question. I'm still waiting for an answer. What would be the burden on the state of Oregon to establish by affidavit or otherwise, lack of a better description, a going forward entitlement to at least segregate these funds so they couldn't be wasted? I think the burden would be that it would afford prisoners the opportunity to deplete their funds. As happened in Sickles, I think Judge Sutton noted that often that does happen, where prisoners learn that their funds can be collected, they attempt to deplete those funds. Wouldn't the answer to that be the statute authorizes the freeze, but then you could hold the statute? I suppose you could provide an immediate, almost like a TRO hearing to challenge the propriety of the freeze? Or is that what the hearing is? Is that what the hearing essentially is? I think so, Your Honor. It was initially set for, so this freeze happened June 2, 2009. The hearing was set for August of 2009. I think that's fairly soon. It ended up getting set over. But otherwise he would have had a hearing within 30 or 45. Right. And I'll note that it's my understanding that had he had the hearing on the date that it was originally set for, there were still funds available, and he hadn't been released yet. So at that point, arguably, much of the harm he's claiming would not have been present. If I heard Ms. Mathison's argument correctly, I think what she was suggesting was that it's not unduly burdensome on the state to make some kind of showing, because even in civil asset forfeitures, either the fact of the grand jury indictment or an affidavit of probable cause in support of a freeze order is submitted to a federal judge, and the assets are frozen on the basis of a showing either to the grand jury or to the federal judge. Why can't the state do that here before an administrative law judge? They could. It's burdensome for the reason I just said. But I think that the reason for a probable cause determination in the civil forfeiture context is that there the act giving rise to liability is disputed. The act is the criminal act itself, as is whether those particular funds are subject to that liability, whether those funds are connected to that criminal act. Here, the act giving rise to liability is just the fact that he was incarcerated. I'm not sure there's any real dispute. And there's no legitimate dispute over that. There might be an arithmetic dispute over how many days and what the daily rate was. Right. And similarly, there's no dispute over whether it doesn't matter where these funds came from. The fact that he has the funds allows ODOT to collect from them. It may not really be analogous to a civil asset forfeiture, but it is more analogous to a prejudgment attachment, which almost every court in the country now says you have to have a hearing. You might have even a lien right under a mortgage or some other document, just like the state here has a lien right for the money, but you can't just take it without a hearing. So why wouldn't it be more analogous to just a normal civil proceeding where you just can't take people's money without some determination that you have a right to take it? And the reason is because all those cases, going back to Fuentes and DICAN and I think W.T. Mitchell and even Quickie Jones, they all involved situations where the government was taking money from A and giving it to B. So I'm sorry again. In most of those situations, it involves a third-party creditor. In Quickie Jones, it involves somebody who's seeking restitution. In this case, we're talking about the government seeking to collect a debt, and that makes the government's interest a lot stronger when we're doing the Matthews v. Eldridge balancing, and particularly when his interest is very minimal. As the Third Circuit recognized, I'm sorry, in the Montañez case, they recognized that a prisoner has a limited – they have a reduced property interest in their funds because they're not allowed to just use their money in an unfettered manner in prison. And so if that interest is minimal, and on the other side of the balancing, we have a strong government interest, which is not present in all those other pre-attachment cases, and also the risk of erroneous deprivation is minimal because it's arithmetic as opposed to, you know, in most of those pre-judgment attachment cases, the risk is whether the debt is valid in the first place. When you throw all those factors into the mix, it seems to me that it's certainly not clearly established that pre-deprivation process is required, especially when we're getting post-deprivation process. That takes the form of a contested hearing, which is sort of the gold standard of due process. I've got a quick question for you. The $5,000, that was determined by correctional officials, correct? Yes, it's just sort of a matter of policy. Officials in the Department of Corrections, based on whatever, gives him $5,000. Yes, Your Honor. But the hearing officer had nothing to do with that. He just applied the same factors that the officials had applied previously as a matter of policy. But at the end of the day, what the hearing officer did was said, State, what you've done is okay. Yes, Your Honor. And, you know, to the extent that the hearing officer got that wrong, to the extent he misapplied state law, this is a Section 1983 claim, and I don't think that a violation of state law entitles plaintiff to relief. There's no constitutional violation if they misapplied state law. Well, how did he violate state law? I'm not saying that he did, Your Honor. What error did he make? I'm sorry? I mean, as I understand it, at the end of the day when he issued his December ruling, he essentially said, State, you're correct, although there's an arithmetical error in favor of the inmate of a few hundred dollars, he actually owes more than what you demanded. So, in essence, all the ALJ did was to say what the State did here was in conformance with the statute. Yes, and I think everything that happened was correct, but I understand the implication of Judge Hawkins' question to be maybe the state judge misapplied, maybe some official misapplied the regulations. I dispute that, but if they did, that's not a constitutional violation. If the inmate has no money in his trust account when he's released, does he still get $5,000 under the regulations? No, no. So, basically, the State gives him his own $5,000 to go out and live on, basically. And whatever other money he has if it's not subject to a dispute. I understand that. But here, you know, the concern is that he gets this settlement because of his diabetes, because of a medical condition, and that doesn't really get factored in, because basically $5,000 is a standard amount, correct? Yes, Your Honor. So, despite his medical situation, despite the circumstances under which the $100,000-plus got put into his trust account, he ends up just like everybody else. Well, he gets entitled to a hearing in which he can show that, in fact, he needs that money, and then he didn't show that. And that's where we get into the complication with the lawyer having to quit, maybe taking the $10,000 or $11,000. We don't know. There's no record of that. You're right, Your Honor. But ultimately, all of these things are discretionary. You know, they only affect ODOT's right to collect. They don't affect the debt itself, and they're all discretionary in terms of whether they're going to waive or give him more money. And ultimately, they're a question of whether the ALJ properly applied state law, not whether a constitutional violation here occurred. What is the right of appeal from the ALJ? He has a right to appeal directly to the Oregon Court of Appeals. He filed a notice of appeal and then defaulted on that. Yes, Your Honor. All right. Thank you. If there are no further questions, thank you. We have about two minutes for rebuttal. Thank you, Your Honor. First, just to touch on the issue of the risk of error, which counsel stressed several times, saying so simply arithmetic. I think if you look in the addendum where we have the relevant statutes and regulations, you'll see the only way it could be arithmetic is the state ignores a good number of the factors they are supposed to consider. By statute, the state must consider the inmates' needs for funds for personal support after release. They consider sources, a variety of sources of information, both the inmates' funds in the prison trust account and outside. There are a number of different factors that they consider there. But I thought they looked at the fact that he'd previously been on the Oregon health plan and they said if he can get a job, he might get medical benefits. Yes. And then they gave him a supply of medication in addition to the $5,000. So are you saying they didn't consider all those factors? So in issuing the ability to pay order and in withdrawing the funds on June 2nd, there's no apparent. Well, you keep saying withdraw. They didn't actually withdraw the funds until after December 29th. Isn't that true? If you look at his inmate trust account records, ER 73 shows a withdrawal of the full cost of care on June 2nd. And so there. Well, they blocked $65,000. I mean, I guess you and I are arguing about what was probably an accounting move, which was to put the money into a blocked account, whether it's a subaccount or it's a general blocked account into which all blocked funds go. The record doesn't tell me. But the state doesn't actually withdraw the money until after the ALJ proceedings are complete. Isn't that how the statute works? Or am I missing something? I don't think the statute specifically speaks to how they withdraw it. The district court order here, ER 16 note 3, noted that the record shows they withdrew them. I understand your point. There is some room for argument on whether if you take it out and put it in someone's name but they don't have access to it, is that in their possession or not? The bottom line is he couldn't spend it. Right. Exactly. He couldn't spend it. But this is not like a raplevin in the sense that the creditor doesn't get to take the money and use it for whatever the creditor wants to use it for after the seizure. No. We're not saying that the state is necessarily spending it on their own. What's your best case for the idea that an inmate in this circumstance has a clearly established right to the kind of hearing you're arguing for? So we think the combination of Quick v. Jones, this court's decision, and Burns 1, which is on the book at the action here, both speak to that. So Quick obviously says it's a general rule there is a pre-deprivation hearing. Burns 1 goes to the point we were just discussing about how much of an inmate's possession do you have to take given that prison funds are limited? And it says there even if the inmate retains full access to the funds and they're simply an attachment that would be sufficient to constitute a withdrawal for purposes of a due process hearing. Just one last question. You had asked about injunction. Is that still a remaining demand on appeals to have injunctive relief? I think we were primarily concerned with the return of the funds, and as noted, I think in the Burns case. Yes or no, is there? There's no real claim for injunctive relief at this point. No. Okay. Thank you. Thank you. Thank both counsel for your argument this morning. The case of Chenault v. Hawks is submitted.
judges: Hawkins, McKeown, Tallman